IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

IN RE:                                    :     CASE NO.  12-05710(ESL)
                                          :
MJS LAS CROABAS PROPERTIES, INC.  :     CHAPTER   11
                                          :
          Debtor                          :
_____  :

## OPINION AND ORDER

This case is before the Court on the Amended Motion for Relief from Automatic Stay (the "Motion for Relief") filed on November 14, 2012, by Federal Deposit Insurance Corporation, as receiver for Westernbank Puerto Rico ("FDIC-R").  On November 19, 2012, Debtor filed its Opposition to the Motion for Relief (the "Opposition"). Thereafter, on December 7, 2012 FDIC-R filed its Reply to Debtor's Opposition (the "Reply").  Debtor and FDIC-R filed a Stipulation of Facts and Evidence in Advance of Final Evidentiary Hearing on the Motion for Relief (the "Stipulation").  On January 14, 2013, the Court held a final evidentiary hearing on the Motion for Relief (the "Hearing").  In accordance with the evidence admitted, testimony presented and the arguments of counsel for the interested parties, the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1.     Debtor is a corporation wholly-owned by Gulfcoast Irrevocable Trust XIII ("Trust XIII").  Debtor has no employees.

2.     Michael Scarfia, Sr. ("Scarfia") is the sole officer of Debtor and the sole trustee and beneficiary of Trust XIII.  Scarfia is an experienced real estate developer.

3.     Debtor is a real estate company formed in 2004 for the purpose of purchasing real property and constructing residential units for marketing and resale to third parties in a development located in Fajardo, Puerto Rico known as The Ocean Club at Seven Seas.

4.     At the time of the Hearing, the Property consisted of 66 remaining unsold units (the "Units") (300 were constructed, and 234 were subsequently sold) plus two undeveloped adjacent lots

(the "Lots"). At the time of the Hearing, of the remaining 66 Units, 7 had been approved by the Court for sale but none of the sales had closed. Debtor is the owner of the Property.

5. Debtor is a single-asset real estate company as that term is defined in the bankruptcy code as its only asset is the Property. The Court previously determined that Debtor is a single-asset real estate company (Doc. 141) and hereby incorporates the findings of fact from that Order.

6. The Property is worth $7,150,000.00.

7. Save for some unfinished trim work, the Units are fully built and complete. Accordingly, all that is left to be done in connection with the Property is to sell the Units and the Lots.

8. Originally, Debtor financed the construction and development of the Property entirely with financing obtained from Westernbank Puerto Rico ("Westernbank") with the loans that constitute the outstanding debt that is the subject of FDIC-R's proof of claims.

9. On April 30, 2010, the Puerto Rico Commissioner of Financial Institutions closed Westernbank and FDIC-R was appointed receiver of Westernbank.

10. On March 15, 2012, FDIC-R filed a Complaint in the U.S. District Court for the District of Puerto Rico seeking to enforce its loan documents against Debtor including, without limitation, a foreclosure of the Property. *See* District Court Case Number 12-1187 (the "District Action").

11. On March 16, 2012, FDIC-R filed a Motion for Appointment of Receiver in the District Action (Dist. Case. No. 12-1187, Doc. 6) wherein FDIC-R stated that Debtor had agreed to the appointment of a receiver in previous loan agreements and related loan documents and that Debtor had threatened to cease payment of certain common area expenses, including the electricity, water and services for the residential units of the Property. Further, FDIC-R stated that Debtor was not actively marketing the Property and was not making payments to FDIC-R.

12. On April 30, 2012, the District Court entered an Appointment of Receiver, which appointed the Receiver as receiver over the Property and empowers the Receiver to manage the Property, market and sell units in the Property, and to otherwise operate, preserve, and maintain the Property and any property relating to the Property for the benefit of the Bankruptcy Estate.

13. The Receiver, through its agent Mario Levine ("Levine"), took possession and control of the Property upon the entry of the Receiver Order on May 2 or May 3, 2012.

14. Levine interviewed the transition committee of the Condominium Association (the "Association"), who indicated frustration with Debtor because Debtor was not funding the Association with any money to maintain the common areas of the Property and there was substantial delay in the transfer of ownership from Debtor to the Association.

15. Upon the first inspection of the Property, Levine noticed issues with deferred maintenance including termite and bug infestation, mold issues, water intrusion and leaks, paint issues, stucco cracking, and wood rot.

16. Additionally, there were damages caused by a storm that Debtor had received insurance proceeds to fix, which Debtor used to pay a separate bill that was due.

17. Debtor did not have enough funds to complete the project and informed FDIC-R of the financial condition. Upon taking possession of the Property, the Receiver took possession of the bank financials and found $35,177.79 in Debtor's bank accounts, which was insufficient to pay all the bills to operate the Property.

18. At the time the Receiver was appointed by the District Court, Debtor owed current billings of approximately $35,000 for the electric bill, $55,000 for the water bill (which Debtor claims were not billed due to problems with the billing authority) and approximately $23,000 to other crucial vendors. FDIC-R subsequently funded the payments.

19. Prior to the Receiver taking possession of the Property, Debtor was not funding any marketing plan.

20. Prior to the Receiver taking possession of the Property, Debtor had sold eight (8) units from January 1, 2011 through April 30, 2012.

21. After taking possession of the Property, the Receiver funded a marketing plan with the funds of FDIC-R and hired Ms. Cecy Alfonso to begin marketing the Property.

22. A non-jury trial was scheduled in the District Action for August 1, 2012.

23. Debtor filed for voluntary bankruptcy protection under Chapter 11 of the Bankruptcy Code on Sunday, July 19, 2012 (the "Petition Date").

24. As of the Petition Date, Debtor owed FDIC-R a total of approximately $20,478,704.36 for the loan granted to MJS Las Croabas, Inc. (the "MJS Loan"). The Mortgage Deeds securing the MJS Loan and reflecting FDIC-R's first priority liens in the Property are perfected.

25. In addition, the Debtor provided a Guarantee of the amounts owed by a related debtor, Sabana del Palmar, Inc. ("Sabana"), Case No. 12-6177 ESL, U.S. Bankruptcy Court for the Middle District of Puerto Rico to FDIC-R, and the debt owed pursuant to the guarantee was approximately $40,709.406.59 as of the Petition Date (the "Sabana Loans").

26. Debtor's only other secured creditor with a filed claim is Centro de Recaudacion de Ingresos Municipales ("CRIM") with a claim in the amount of $332,838.42. Iris Mirta Mendez Robles ("Robles") is listed in the schedules with a contingent secured claim in the amount of $250,000. The only priority unsecured creditors are Municipality of Fajardo with a claim in the amount of $102,805.74 and Department of Treasury with a claim in the amount of $20,716.

27. There is a total of $14,158,056 in unsecured debt, in addition to the amounts owed to FDIC-R, including $10,908,742 owed to Gibraltar Construction Company.

28. Based on the value of the Property and 11 U.S.C. § 506(a), FDIC-R's deficiency claim from the MJS Loan in the amount of $13,778,204.36 is unsecured and the entire amount of the Sabana Loans of $40,709,406.59 is unsecured, for a total of $54,487,610.95.

29. FDIC-R holds approximately 79% of the unsecured claims in this case.

30. The marketing efforts of Ms. Alfonso directly led to the seven (7) sales of units approved by the Court since the Petition Date, two (2) of which have closed since the hearing on the Motion for Relief.

31. It will cost approximately $4,700 in repairs and finishing work per unit to complete sales of the remaining sixty-four (64) units.

32. FDIC-R has funded all necessary expenses of operating the Property since the Receiver took possession of the Property.

33. Gibraltar Construction Company is wholly-owned by Gulfcoast Irrevocable Trust I. Scarfia is the Trustee of Gulfcoast Irrevocable I and Gulfcoast Irrevocable Trust XIII.

34. Debtor submitted a Sell-Out Pro Forma (the "Pro Forma") at the Hearing wherein Debtor proposes to sell the unsold units of the Property over a three-year period. Debtor's Pro Forma involves managing the Property and apportioning a percentage of the proceeds of the sales of Units of the Property to unsecured creditors. Further, the Pro Forma is contingent on Debtor obtaining post-petition financing and giving super-priority status to the proposed lender.

35. Debtor's Pro Forma includes a "Phase 1" sell-out of the unsold units and a "Phase 2" plan to develop the Lots.

36. Debtor offered no evidence as to how it would market the Units for sale other than noting that it would cost $339,500 in marketing expenses in the Pro Forma.

37. Debtor's Pro Forma reflects that Debtor's total expenses for Phase 1 will amount to $10,658,000.00 (including paying the FDIC-R a total of $7,150,000 for its secured claim without allowing for the possibility of a section 1111(b) election or a different valuation of the Property at confirmation) during the life of the Pro Forma and the total gross sales as to Phase 1 will only amount to a maximum of $15,249,000.

38. Debtor testified that if FDIC-R's secured claim was $20,000,000, then it would not be able to reorganize.

DISCUSSION

The automatic stay provisions of 11 U.S.C. § 362(a) are fundamental to allow a chapter 11 debtor a reasonable attempt to reorganize. The automatic stay acts as an injunction to protect the property of the estate and becomes operative by the mere filing of a bankruptcy petition. In re Soares, 107 F.3d 969, 971 (1st Cir. 1997). Hence, the "automatic" reference in the statutory provision and its effect. The broad scope and strength of the automatic stay in favor of the debtor is balanced by the rights afforded to creditors in 11 U.S.C. § 362(d) - (g). A party seeking relief from the automatic stay must file a motion under § 362(d) and Fed. R. Bankr. P. 4001.

An undersecured creditor may file a motion for relief from stay against property of the estate on the ground that the debtor has no equity in the property and that the property is not necessary to an effective reorganization. 11 U.S.C. § 362(d)(2). The party seeking relief has the burden of proving that the debtor has no equity in the property, and the party opposing the relief, generally the debtor,

5

has the burden on all other issues. 11 U.S.C. § 362(g). In this case, it is undisputed that there is no equity in the properties given as collateral to the moving creditor, the FDIC-R. Thus, the issue before the court is whether the debtor has met its burden of establishing that the property is necessary to an effective reorganization.

The Supreme Court in <u>United Savings Association of Texas v. Timbers of Inwood Forest Associates</u> ("Timbers"), 484 U.S. 365, 375-376 (1988), indicated that there be a reasonable possibility of a successful reorganization within a reasonable time. The debtor has submitted a proposed or sketch chapter 11 plan purporting to show that reorganization is feasible. The court must consider if it is indeed a plan that has the reasonable possibility of being confirmed within a reasonable time. The court notes that on December 5, 2012 an opinion and order was entered finding that the debtor is a single asset real estate case. Although the <u>Timbers</u> test has been limited by the 1994 amendment to § 362(d)(3) of the Bankruptcy Code with respect to single asset real estate cases, the court finds that such a provision need not be invoked in this case.

FDIC-R succeeded to all right, title and interests of Westernbank in the First Loan and Second Loan, and all documents relating to these Loans pursuant to 12 U.S.C. §§ 1821(d)(2)(A)(i). FDIC-R seeks relief from the automatic stay under both 11 U.S.C. § 362(d)(1) and (d)(2) seeking to enforce its loan documents against Debtor including, without limitation, a foreclosure of the Property in the District Court pursuant to the pending District Action. For the reasons stated below, FDIC-R is entitled to relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(2) as Debtor does not have equity in the Property and the Property is not necessary to an effective reorganization:

The Court finds that Debtor has no equity in the Property. FDIC-R, as movant on the Motion for Relief, has the burden to prove that Debtor lacks equity in the Property pursuant to 11 U.S.C. § 362(g)(1). It is undisputed that the Debtor has no equity in the Property as FDIC-R's debts secured by liens on the Property exceed the value of the property. FDIC-R's debts of over $60,000,000 secured by liens on the Property drastically exceed the Property's value of $7,150,000.

The FDIC-R having met its initial burden of showing that there is no equity in the properties given as collateral to its loans, the Debtor must show that the Property is necessary for an effective reorganization. Pursuant to 11 U.S.C. § 362(g)(2), Debtor has the burden of proof on all issues

6

besides lack of equity in regards to relief from the automatic stay under 11 U.S.C. § 362(d)(2). In particular, Debtor has the burden to prove a "reasonable possibility of a successful reorganization within a reasonable time." In re Anderson, 913 F. 2d 530, 531 (8th Cir. 1990). Debtor's Property is not necessary to an effective reorganization unless Debtor proves a "reasonable possibility of a successful reorganization within a reasonable time." United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 375–76 (1988). As stated by the Eleventh Circuit, "[f]or property to be 'necessary to an effective reorganization' of the debtor . . . it must be demonstrated that an effective reorganization is realistically possible; the mere fact that the property is indispensable to the debtor's survival is insufficient." In re Albany Partners, Ltd., 749 F. 2d 670, 673, n. 7 (Bankr. 11th Cir. 1984) (Bankruptcy was dismissed and automatic stay annulled where court found it unlikely that Debtor operator of a hotel could implement an effective Chapter 11 reorganization.); In re Snapwoods Apartments of Dekalb County, Ltd., 153 B.R. 524, 526 (Bankr. D. Ohio 1993) (Automatic stay lifted as to secured creditor where Debtor could not demonstrate that successful reorganization was likely as the Debtor's past and current net operating income of apartment complex was considerably less than their projected amount.); In re Canal Place Ltd. Partnership, 921 F. 2d 569, 577 (Bankr. La. 1991) (Automatic stay lifted where Debtor's entire plan was based on avoiding foreclosure while awaiting more favorable economic conditions.); In re Bloomington Investors, Limited Partnership, 114 B.R. 174 (D. Minn. 1990) (Stay lifted where hotel was worth approximately $6,000,000 less than amount of secured claim and Debtor did not meet its burden of effectuating successful reorganization).

The court finds that the Debtor has not met its burden to demonstrate a reasonable possibility of reorganization within a reasonable amount of time. The Court did not consider the Debtor's plans regarding development of the Lots as "Phase II" as part of its analysis because, admittedly, those plans are not feasible within a reasonable amount of time. The evidence showed that Debtor has little possibility of a successful reorganization for the following reasons.

It is unlikely that Debtor can generate enough income to pay the secured debt owed to FDIC-R, particularly if FDIC-R makes an 11 U.S.C. § 1111(b) election. If the FDIC-R makes a §1111(b)(2) election, the Debtor would be required to treat the entire amount of FDIC-R's claim as secured,

without regard to the value of the Property. See In re Jones, 152 B.R 155, 158 (Bankr. E.D. Mich. 1993) ("[A]n undersecured creditor can defend itself against strip down by making the § 1111(b)(2) election, which generally permits the creditor to maintain secured status with respect to its entire claim, rather than in an amount equal only to the collateral's value."); In re Griffiths, 27 B.R. 873, 876-77 (Bankr. D. Kan. 1983) (Creditor's § 1111(b)(2) election prevents a "cram down" of creditor's secured claim). Specifically, Debtor's assets are worth far less than the amount of FDIC-R's secured claims. If Debtor were to "operate," Debtor would not be able to generate more than the value of the unsold units of the Property, which are completely encumbered by FDIC-R. Therefore, all income received by Debtor through the sale of its properties would be directed to satisfy FDIC-R's right to payment based on its secured claim. See 11 U.S.C. §1129(b)(2)(A)(1) (absolute priority rule as it applies to secured creditors); In re Swedeland Development Group, Inc., 16 F. 3d 552, 567 (3d Cir. 1994) (Court "will not hold that a debtor can achieve an effective reorganization by diminishing the value of its pre-petition creditor's lien interest" and where "the net present value of" Debtor's anticipated cash flow "would be insufficient to satisfy" secured creditor's claim.). Debtor's Pro Forma demonstrated that the maximum amount that can be generated from the sales of the Property is $15,249,000, which pales in comparison to the amount of $61,188,110.95, which is the amount owed by Debtor to FDIC-R that is secured by liens on the Property. In addition, in view of the uncontested $7,150,000 value of the Property, the Debtor's $15,249,000 estimate is suspect, and if proven true at confirmation, would suggest the true value of the Property is higher than $7,150,000, and FDIC-R's secured claim would thus be higher, even with a § 1111(b) election. Further, in the event FDIC-R makes an election under § 1111(b) in connection with both of the Loans or just the MJS Loan, Debtor admits that it would not be able to present a feasible plan to the Court as Debtor would be required to treat FDIC-R's electing claim as fully secured under 11 U.S.C. § 1111(b)(2) and pay FDIC-R $61,188,110.95: According to Debtor's own testimony, Debtor cannot even reorganize if FDIC-R's claim was $20,000,000. Accordingly, Debtor has not met its burden of proof that it can effectively reorganize in a reasonable amount of time. In re River East Plaza, LLC, 669 F. 3d 826, 833-34 (7th Cir. 2012) (Bankruptcy court properly dismissed case in single-asset real estate case and granted primary creditor relief from the automatic stay where creditor made an 1111(b) election opting to treat

entire claim, including deficiency of approximately $25,000,000, as secured for purposes of bankruptcy plan and debtor could not provide creditor substitute collateral to satisfy the requirements of the Bankruptcy Code.)

Debtor cannot reorganize within a reasonable amount of time as it has no ability to fund operations, including marketing efforts, either during or after bankruptcy. Debtor's projected source of funds is entirely from the sale of the Units, Debtor currently has very little funds, and Debtor would rely on post-petition financing to fund the operations and marketing of the Property. The Debtor was doing no marketing prior to the Petition Date and offered no evidence on what sort of marketing the Debtor planned if it got control of the Property again. With regard to the post-petition financing, Debtor submitted a letter from FYM Hughes, LLC that says FYM Hughes will provide a maximum of $500,000 in Debtor in Possession to Debtor, provided various conditions were met by the Debtor (the "Potential Financing"). Notably, no representative from FYM Hughes testified at the hearing and the Potential Financing is dependent on "Debtor in Possession" and not exit financing. Further, the Potential Financing is contingent on FYM Hughes, LLC obtaining "a priority claim over all secured creditors and a secured priority payment over the bankruptcy estate." The Potential Financing is governed by 11 U.S.C. § 364(d), which requires Debtor to provide adequate protection of FDIC-R's secured claim in the Property in order to obtain the Potential Financing. The Court finds that Debtor is not likely to obtain the Potential Financing as Debtor presented no evidence to show that it can provide FDIC-R the necessary adequate protection under 11 U.S.C. § 364(d). Debtor failed to prove that the Potential Financing would maintain or increase the value of the Property to protect FDIC-R's secured interests in the Property. In re 495 Central Park Ave. Corp., 136 B.R. 626, 631 (S.D.N.Y. 1992) (Goal of adequate protection for purposes of provision entitling Debtor to obtain financing secured by liens senior to all other interests is to safeguard secured creditor from diminution in value of its interest.); Suntrust Bank v. Denmark Construction, Inc., 406 B.R. 683, 700-701 (E.D.N.C. 2009) (Slim equity cushion and speculative possibility of enhancement of secured creditor's collateral did not qualify as adequate protection for Debtor seeking financing on superpriority basis.); In re Mosello, 195 B.R. 277, 287-88 (S.D.N.Y. 1996) (Debtor could not provide adequate protection necessary to secured creditor necessary to obtain superpriority financing as there was only speculative

benefit to secured creditor that property's value would increase more than the amount of the financing as it was not clear that the financing would increase the value of the property). In re Timber Products, Inc., 125 B.R. 433, 437 (Bankr. W.D. Pa. 1990) (Debtor not entitled to superpriority loan due to insignificant equity cushion in property securing secured creditor's lien); Matter of St. Petersburg Hotel Associates, Ltd., 44 B.R. 944, 946 (M.D. Fla. 1984) (Debtor not entitled to superpriority loan since secured creditor was already undercollateralized). To the contrary, the evidence showed that FDIC-R is already severely undercollateralized and there is no source of funding other than sale of FDIC-R's collateral (the Property), and that such sale would not generate new or replacement collateral for FDIC-R but instead would diminish FDIC-R's collateral further. Accordingly, Debtor cannot obtain superpriority funding in this case. Further, Debtor has not offered any evidence that it can obtain debtor-in-possession or exit financing from any other source and it is doubtful that it can since the Debtor has no operating income, its assets are fully encumbered, and Debtor's principal, Mr. Scarfia, Sr., has recently filed personal bankruptcy. Accordingly, the Debtor has not provided evidence demonstrating that it can obtain financing or otherwise generate enough money to pay the $10,658,000 in Debtor's own estimate of expenses necessary to operate the Property during the life of the Pro Forma.

The Debtor has not shown that it will be able to meet the requirements of 11 U.S.C. § 1129(a)(10) in obtaining the approval of at least one qualified impaired class of creditors as FDIC-R is in control of all conceivable qualified voting classes and has stated that it will not vote to approve a plan filed by Debtor due to Debtor's past mismanagement and poor financial performance.

In any plan submitted by the Court, assuming no § 1111(b) election, FDIC-R's secured claim will be in its own separate class in the amount of $7,150,000, the value of the Property pursuant to 11 U.S.C. § 506(a). The secured class containing FDIC-R's secured claim will be impaired and will not vote to approve any plan proposed by Debtor in this case. The deficiency for FDIC-R's secured claim on the MJS Loan in the amount of $13,778,204.36 and the entire claim on the Sabana Loan of $40,709,406.59 will be part of the unsecured class of creditors, making FDIC-R's unsecured claim $54,487,610.95 (treatment of which is discussed below). The only other secured creditor that has filed a proof of claim is CRIM, which cannot vote to approve a plan as a secured tax creditor entitled

10

to priority is not an impaired creditor.

The only unsecured priority claims are held by Municipality of Fajardo and the Department of Treasury (the "Priority Tax Creditors"). In any plan submitted to the Court, the Debtor must assign the priority tax creditors to their own unimpaired class pursuant to 11 U.S.C. § 1122. This class is not permitted to vote on any proposed plan. In re Equitable Development Corporation, 196 B.R. 889, 893 (Bankr. S. D. Ala. 1996) (holding priority tax creditors are not an impaired class eligible to vote on a plan of reorganization); Travelers Ins. Co. v. Bryson Properties XVIII, 961 F. 2d 496, 501 n. 8 (4th Cir. 1992) ("[P]riority tax claimants, which receive preferential treatment under the Code, are not an impaired class that can accept a plan and bind other truly impaired creditors to a cram down".). As to nonpriority unsecured debt, Debtor owes a total of $68,645,667 in unsecured debt, including $54,487,610.95 to FDIC-R. Unless it elects otherwise, FDIC-R undeniably will be in control of the unsecured class as it holds 79% of the claims in the unsecured class. Since FDIC-R is in control of more than one-third of the amount owed to unsecured creditors in this case, the unsecured class can only accept a plan if FDIC-R votes to approve a plan, which FDIC-R has stated it will not do. *See* 11 U.S.C. § 1126(c) ("A class of claims has accepted a plan if such plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors that have accepted or rejected such plan."). Accordingly, the unsecured class will be impaired and likely will not be voting to approve any plan proposed by Debtor in this case.

Further, an insider of Debtor hold $10,908,742 of the unsecured debt not held by FDIC-R and thus their votes do not count toward the one accepting class requirement of § 1129(a)(10). Gibraltar Construction, Inc. ("GCI"), a company controlled by Scarfia, is allegedly owed $10,908,742 by Debtor. GCI is an insider of Debtor as defined under § 101(31), which states an "insider" includes "an insider of an affiliate as if such affiliate were the debtor." Debtor is wholly-owned by Trust XIII. GCI is wholly-owned by Gulfcoast Irrevocable Trust I ("Trust I"). Michael Scarfia ("Scarfia") is the trustee and sole beneficiary of both Trust I and Trust XIII (collectively, the "Trusts"). Scarfia also is the sole director and officer of Debtor. Scarfia is an affiliate of Debtor. An affiliate includes, *inter alia*, an "entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or

11

more of the outstanding voting securities of the debtor." 11 U.S.C. § 101(2). An entity includes a person pursuant to 11 U.S.C. § 101(15). In the instant case, Scarfia is in complete control of Trust XIII, which holds 100 percent of Debtor's voting securities. Accordingly, GCI is an insider of Debtor. Pursuant to 11 U.S.C. § 1129(a)(10), in determining whether there is at least one class accepting a plan, the acceptance by insiders must not be considered. FDIC-R holds 94% ($54,487,611 of $57,736,925) of the unsecured claims to be considered for the purpose of determining whether or not the unsecured class has accepted a plan of reorganization.

The Pro Forma outlined by Debtor at the Hearing is in contravention of the Bankruptcy Code and cannot be confirmed for other reasons. Debtor's proposal to distribute proceeds of the sales of the Property to unsecured creditors is in violation of the absolute priority rule. As described in detail above, Debtor's assets are worth far less than the amount of FDIC-R's secured claim. If Debtor were to "operate," it would never be able to generate more than the value of the unsold units of the Property, which are completely encumbered by FDIC-R. Therefore, all income received by Debtor through the sale of its Property would be directed to satisfy FDIC-R's right to payment. *See* 11 U.S.C. §1129(b)(2)(A)(1) (absolute priority rule as it applies to secured creditors); In re Swedeland Development Group, Inc., 16 F. 3d at 567 (3d Cir. 1994) (Court "will not hold that a debtor can achieve an effective reorganization by diminishing the value of its pre-petition creditor's lien interest" and where "the net present value of" Debtor's anticipated cash flow "would be insufficient to satisfy" secured creditor's claim.). Debtor may not circumvent the absolute priority rule to pay unsecured creditors until FDIC-R is paid in full, which is impossible in this case based on the value of the Property.

The plan described by Debtor would have to include improper gerrymandering to circumvent the requirement of 11 U.S.C. § 1129(a)(10) and the fact that FDIC-R is in control of all conceivable impaired classes. Debtor may not separate FDIC-R's unsecured claims from the remainder of the unsecured claims absent a legitimate business reason. In re Boston Post Road Ltd. Partnership, 21 F. 3d 477, 483 (2d Cir. 1994) (Debtor must provide credible proof for any legitimate reason for segregating principal creditor's unsecured claim from general unsecured claims.); In re Barakat, 99 F. 3d 1520, 1526 (9th Cir. 1996) (Debtor impermissibly classified secured creditor's deficiency claim

12

from general unsecured claims without legitimate business reason.). Debtor has not and cannot provide a legitimate business reason to treat FDIC-R's unsecured claim any differently than the other unsecured creditors in this case.

FDIC-R also sought relief from the automatic stay pursuant to 11 U.S.C. 362(d)(1) for cause on the grounds that Debtor filed this case in bad faith and cannot propose a plan in good faith as required by 11 U.S.C. §1129(a)(3). As this Court has stated, "[t]he determination of whether the movant has established prima facie that there is a lack of good faith (or bad faith) in the filing of a bankruptcy petition is a fact intensive inquiry in which the court analyzes the totality of the circumstances." In re Costa Bonita Beach Resort, Inc., 479 B.R. 14, 40 (Bankr. D.P.R. 2012) (citations omitted). Courts consider a number of factors in determining whether a petition has been filed in bad faith. In re Village Green Realty Trust, 113 B.R. 105, 115-16 (Bankr. Mass. 1990). Based on a review of the relevant factors and the evidence presented, the Court finds that this case was not filed in bad faith and the request for relief under §362(d)(1) is denied. While the evidence showed that there were maintenance issues due to shortage of funds, they did not rise to the level of bad faith or mismanagement.

### CONCLUSION

The Court, based on the Findings of Fact and Conclusions of Law stated herein, hereby grants the Motion for Relief (Doc. 114) filed by FDIC-R and hereby grants FDIC-R relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(2) in order to permit FDIC-R to enforce its loan documents against Debtor including, without limitation, a foreclosure of the Property in the District Action as FDIC-R has proven there is no equity in the Property and Debtor has failed to prove that it can successfully reorganize in a reasonable amount of time.

SO ORDERED.

In San Juan, Puerto Rico, this 29th day of May, 2013.

Enrique S. Lamoutte
United States Bankruptcy Court